In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-15-00525-CR
_____

DANE ALEXANDER DENNISON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 2
Jefferson County, Texas
Trial Cause No. 309604

## MEMORANDUM OPINION

Dane Alexander Dennison (Dennison or Appellant) was charged by information with driving while intoxicated, level 0.15 or more, a class A misdemeanor. *See* Tex. Penal Code Ann. § 49.04(d) (West Supp. 2016).[1] A jury found Dennison guilty. The trial court assessed punishment of 180 days of confinement in the county jail and a fine of $1,500, and placed Dennison on

[1] We cite to the current version of the statute unless a previous version of the statute applies and the subsequent amendments would materially affect our analysis.

1

probation for two years, required Dennison to serve 8 days in the county jail, placed an ignition interlocking device on Dennison's vehicle, and imposed other conditions of probation. Dennison timely filed a notice of appeal.

Dennison's arguments on appeal challenge the trial court's denial of his motion to suppress. Dennison contends that the trial court committed reversible error in denying his motion to suppress because the warrantless blood draw was done in violation of Dennison's Fourth Amendment rights under the Constitution of the United States and under Article I, section 9 of the Texas Constitution. The State argues that exigent circumstances existed to justify the warrantless blood draw. On appeal, Dennison specifically challenges the trial court's findings of fact 11, 12, and 15, and the trial court's conclusion of law that, based upon the totality of circumstances, there were exigent circumstances that justified the warrantless blood draw. Dennison contends that "[r]elying on a statement made by a Sheriff's Deputy about the unavailability of one out of several Jefferson County judges during the late evening hours does not create exigent circumstances to excuse the warrant requirement to obtain a blood sample." We affirm.

## Motion to Suppress

Prior to trial, Dennison filed a motion to suppress all evidence relating to his warrantless blood draw, including the test results pertaining to the blood draw,

arguing that the blood specimen evidence was seized in violation of his Fourth Amendment right to be free from an unreasonable search and seizure. The State argued that the warrantless blood draw was done pursuant to exigent circumstances. *See* Tex. Transp. Code Ann. § 724.012 (West 2011). Prior to jury selection, the trial court held a hearing on the motion to suppress.

At the hearing, in response to Dennison's position that the warrantless blood draw was in violation of his rights under the Fourth Amendment of the United States Constitution and Article I, section 9 of the Texas Constitution, the State argued that the warrantless blood draw was justified because of exigent circumstances. At the conclusion of the hearing, the trial court announced its ruling on the record and denied the motion to suppress. The parties proceeded with the jury trial. Subsequently, the trial court entered written findings of fact and conclusions of law in support of the denial of the motion to suppress.

<u>Evidence Presented at the Suppression Hearing</u>

The State called Deputy Guadalupe James Flores, Officer Michael Wirfs, and Trooper Kimberly Sarrett as witnesses at the hearing. The State also made a proffer of three exhibits at the hearing: Exhibit 1, a November 2015 article from The Examiner; Exhibit 2, an October 2014 article from the Beaumont Enterprise

3

website; and Exhibit 3, a copy of a Laboratory Report. The trial court sustained Dennison's objections to all three exhibits.

According to Jefferson County Sheriff's Deputy Guadalupe James Flores (Deputy Flores), on May 9, 2014, he and his training officer responded to an accident on Highway 73 to assist the Texas Department of Public Safety (DPS). The accident involved two vehicles and one of the vehicles was registered to Dennison. At the time of the accident, Deputy Flores's father, Guadalupe Flores, was the presiding Judge over Jefferson County Court at Law No. 2. After reviewing a segment of the police video footage from the evening in question, Deputy Flores testified that one of the voices that can be heard on the video was his own voice and that he was the person who stated Judge Flores was "unattainable." Deputy Flores testified that he knew that Judge Flores was "unattainable[]" that night because the Deputy had spoken to Judge Flores prior to that night, and Deputy Flores knew that his father, Judge Flores, was "out of town" and outside of Jefferson County at that time.

On cross-examination, Deputy Flores agreed that he did not know if anyone talked to Judge Flores that night, or if anyone attempted to call Judge Flores that evening. Deputy Flores agreed that he was familiar with Judge Flores's practice of getting a blood warrant back within fifteen to twenty minutes through the use of a

4

fax machine, and Deputy Flores agreed that even if Judge Flores was in Houston at the time, it was possible that Judge Flores could have been contacted by cell phone, and a warrant could have been obtained "in about 15, 20 minutes[.]"

Michael Wirfs (Officer Wirfs), a Beaumont patrol officer, also testified at the hearing. At the time of the hearing, Officer Wirfs had been a peace officer for four years and he stated that he was familiar with the procedures used for investigating cases involving driving while intoxicated that existed at the time of this accident. Officer Wirfs testified that he was also familiar with situations where a warrant can be applied for to draw blood from a suspect, and he testified about the procedure:

> Q. If I may, in May of 2014, how would that have worked back then?
>
> A. Okay. May of 2014 there were certain stipulations. It would be if someone was transported to the hospital for medical care, is involved in -- met a party in a wreck; if they were under a certain age; if they had three or more convictions; or this is their third or more arrest for DWI; if serious bodily injury occurred; if death occurred, things like that.
>
> Q. Okay. Was there a policy in place at that time if you wanted to obtain a warrant to obtain someone's blood?
>
> A. Yes, there was.
>
> Q. How would you -- how would you apply for a warrant in such a case?

5

A. Basically we had a printout on a computer, and it would say warrant that was -- in Beaumont, someone wants to fill in the blank type warrant, you fill out your information; and we would try and contact a judge to get the warrant signed off on.

Q. And how would you try and contact a judge?

A. Typically we would have dispatch try and contact a judge. We had certain ones, of course, only certain judges could sign off on a warrant; but we would have them try and contact them.

Q. Okay. Now, after -- now, were there times when it was easier to get a judge than other times?

A. Yes, sir.

Q. When were the times it was more difficult to get a judge?

A. Late at night, middle of the night, early in the morning. Things like that.

Q. Would it be fair to say after office hours it would be a difficult time?

A. Yes, sir.

Officer Wirfs testified that, based upon his experience as an officer, at the time of the accident there were no certain judges who were "routinely available" to sign off on blood warrants, but "more often than not Judge Flores would be available[,]" and if Judge Flores was not available it would be very difficult to find another judge to sign off on a warrant. Officer Wirfs testified that based on his experience it would take "[a] long time, two to -- minimum two hours[]" to get a

6

warrant. On cross-examination, Officer Wirfs admitted that he did not know whether other judges in Jefferson County had signed blood warrants, he did not know what attempt was made to get a warrant in this case, he did not know whether Trooper Sarrett knew the Beaumont police policy, he did not know whether the dispatch had a list of cell phone and home numbers of all the judges who could sign blood warrants, and he did not know whether any attempts were made to contact judges that night.

Kimberly Sarrett (Trooper Sarrett) testified that she was currently employed with the Boise Police Department in Boise, Idaho, but she formerly worked as a Texas DPS officer for about four years. At the time of the accident on May 9, 2014, she held a position with DPS traffic investigation and enforcement. Trooper Sarrett testified that at some point during the accident investigation, she believed she might need to obtain a warrant for a blood draw. Trooper Sarrett explained that, at the time of the accident, she was not aware of a procedure in place to obtain a blood draw warrant in the evening and that, based upon past experience, Judge Flores was the only judge used for such warrants because "he was the only one who was available anytime we tried to get ahold of him later in the evening." According to Trooper Sarrett, typically, she would contact Judge Flores by telephone, but given the facts that she was aware of on the evening in question,

Judge Flores was not available to sign a warrant. Trooper Sarrett testified that "[Judge Flores's] son was actually at the crash scene and said that [Judge Flores] was out of town." Trooper Sarrett explained that since May of 2014, a procedure has been developed to address this issue, whereby officers may use a tablet to send a request for a warrant to a list of "on-call" judges. According to Trooper Sarrett, because Judge Flores was not available she could not obtain a warrant in this case, and she did not know how long it would have taken to find another judge. By the time the blood draw occurred, it had been "[a]bout three -- almost four hours[]" since the accident occurred. Trooper Sarrett agreed that if there had been any alcohol in Dennison's system, it would have been dissipating at that point. Trooper Sarrett agreed that if she had waited longer, it could have taken several hours to find another judge and the blood alcohol content test would have been less accurate. Trooper Sarrett testified that before she discovered she needed a warrant she was working the accident scene and investigation on Highway 73. Trooper Sarrett also explained that the hospital to which Dennison was taken is on the other end of the county. According to Trooper Sarrett, Dennison was on a stretcher and receiving medical treatment at the accident scene.

The accident occurred at 9:00 p.m. on May 9, 2014, and Trooper Sarrett did not get to the hospital until about 12:00 midnight. Trooper Sarrett did not make the

determination that she had probable cause for a warrant until she observed Dennison at the hospital. Trooper Sarrett explained that the DPS only had one to three troopers on the night shift in question to cover the entire county, and Trooper Sarrett testified that to obtain a warrant at the hospital she would have needed to find a computer in the hospital to use, fill out a form, and then try to get it faxed to a judge if a judge was available. Trooper Sarrett also believed that Dennison was a "flight risk[]" because, when she initially arrived at the hospital, Dennison was trying to leave and had checked himself out of the hospital.

According to Trooper Sarrett, while she was administering the field sobriety tests, Dennison informed her that he did not want to continue with the tests, that he had a brain injury, and he wanted to check himself back into the hospital. Trooper Sarrett explained that once he went back into the hospital he could have received medications or ingested other drugs or alcohol, which would then alter the blood alcohol content, or he could have sobered up, impacting the reliability of the blood analysis.

When Trooper Sarrett first encountered Dennison at the hospital, Dennison was walking out of the hospital. It took less than one hour after she first saw Dennison at the hospital for her to develop probable cause to believe he might be intoxicated. According to Trooper Sarrett, Dennison's eyes were red and glassy

9

and as she began to talk to him "the smell of alcohol was strong." She explained at the hearing that she did not smell alcohol on him at the crash scene because she was not able to talk with him in close proximity at the scene. After encountering Dennison at the hospital, Trooper Sarrett asked Dennison to step over to her patrol car so she could record a video of the sobriety field testing. Trooper Sarrett testified that she administered the horizontal gaze nystagmus (HGN) test, on which Dennison showed six clues indicating intoxication.[2] When she attempted to administer the walk-and-turn test, Dennison refused the test and said he had a brain injury. According to Trooper Sarrett, after she read the DIC warnings to Dennison, the warrantless blood draw was performed by the hospital staff at "12:41[a.m.]"

On cross-examination, Trooper Sarrett agreed that she did not attempt to locate Judge Flores or any other judge, and she did not call her dispatcher at the DPS and ask them to contact any other judge. Trooper Sarrett agreed that there was another DPS officer with her at the scene of the accident and at the hospital. Trooper Sarrett agreed that she did not ask the other officer to call dispatch regarding getting a judge for a warrant because "there wasn't a judge available."

---

[2]*See, e.g., Compton v. State*, 120 S.W.3d 375, 377 (Tex. App.—Texarkana 2003, pet. ref'd) (noting the total possible clues on the HGN test is six).

10

<u>Trial Court's Written Findings of Fact and Conclusions of Law</u>

The trial court made twenty-eight findings of fact, with one finding having multiple subparts, and one conclusion of law, with multiple subparts. With respect to the credibility of the witnesses, the trial court found that Trooper Sarrett, Officer Wirfs, and Deputy Flores were credible and reliable witnesses. The trial court also made the following factual findings that Dennison does not challenge on appeal: Trooper Sarrett, a certified peace officer, was dispatched to the scene of a two-vehicle accident on May 9, 2014, and arrived at 9:00 p.m.; three people were injured in the accident; Dane Dennison was the driver of the vehicle at fault in the accident; no officer was able to conduct field sobriety testing at the accident scene because Dennison was being strapped to a stretcher and taken to a hospital; Trooper Sarrett stayed at the scene to complete her investigation of the accident, which required approximately two hours; there was no on-call system in place to get in touch with another judge in May of 2014 and no official procedure was in place to obtain a blood draw warrant; it was the officers' experience that if Judge Flores was unavailable they would not be able to find a judge to sign a warrant; and, after Trooper Sarrett completed her investigation at the scene, she drove to the hospital, which was about a thirty-minute drive.

11

On appeal, Dennison specifically challenges the following findings of fact by the trial court:

11) While at the scene, Trooper Sarrett discovered through Deputy Flores, a reliable source, that Judge Flores, the only judge available to sign a blood warrant to the knowledge of the officers based on past experience, was in Houston and could not be reached for a warrant. Deputy Flores was Judge Flores' son and had personal knowledge that his father was unavailable to sign a warrant.

12) It was known to the officers that it was more difficult to reach a judge late at night and early in the morning than during office hours. No judge was routinely or consistently available to sign off on blood warrants at that time.

15) Trooper Sarrett could not task someone else with obtaining a warrant since DPS works all crashes and each officer takes care of his/her own cases. That night there were only two or three DPS troopers to cover the entirety of Jefferson County. Tasking another officer with obtaining a warrant would have left Jefferson County bereft of troopers to patrol the county.

Dennison argues that Deputy Flores's and Trooper Sarrett's testimony do not support finding of fact number 11 because Trooper Sarrett could not know whether Judge Flores was available if Trooper Sarrett did not "directly attempt direct communication" with the Judge. Dennison asserts that Trooper Sarrett's testimony contradicts finding of fact number 12 because Trooper Sarrett testified that Judge Flores was the only judge she knew that was always available to sign warrants in the evening and late at night. As to finding of fact number 15, Dennison argues that Trooper Sarrett testified that there was another trooper at the

scene of the accident and with Trooper Sarrett throughout the investigation and at the hospital. According to Dennison, no evidence was presented that the DPS policy is that each officer investigates his or her own crash scene exclusively or that other troopers may not assist other troopers.

Dennison also challenges the following conclusion of law:

b. Based upon the totality of circumstances, exigent circumstances existed in this instance to justify the warrantless blood draw in order to prevent the destruction of evidence of the alcohol concentration of Dennison's blood.

## Discussion

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion. *Id*. We give almost total deference to the trial court's determination of historical facts, particularly when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). The same deference is afforded the trial court with respect to its rulings on the application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor. *Id*. For mixed questions of law and fact that do not fall within that category, a reviewing court conducts a de novo review. *Id*.

13

At a suppression hearing, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). A trial court may choose to believe or to disbelieve all or any part of a witness's testimony, even if that testimony is uncontroverted. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We must uphold the trial court's ruling on a motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case, even if the trial court gave the wrong reason for its ruling. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]" U.S. Const. amend. IV. Taking blood from a suspect requires an intrusion into the human body and implicates an individual's "most personal and deep-rooted expectations of privacy," and therefore such falls under the Fourth Amendment's warrant requirement. *Cole v. State*, 490 S.W.3d 918, 923 (Tex. Crim. App. 2016) (quoting *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013)).

The Court of Criminal Appeals has explained that the exceptions to the requirement of a search warrant include "voluntary consent to search, search under exigent circumstances, and search incident to arrest[.]" *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003). Once the accused establishes that the search was conducted without a warrant, it is the State's burden to show that the warrantless search falls within one of these exceptions. *See id*; *see also State v. Betts*, 397 S.W.3d 198, 207 (Tex. Crim. App. 2013). Because there was no search warrant for the blood draw performed on Dennison, the State had the burden of proof to establish an exception to justify the warrantless search and seizure of his blood. *See McGee*, 105 S.W.3d at 615. On appeal, the State relies only on exigent circumstances as the basis for its failure to obtain a warrant.

The touchstone of the Fourth Amendment is "reasonableness." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (quoting *Bingham City v. Stuart*, 547 U.S. 398, 403 (2006)). When the government undertakes a search for the purpose of furthering a criminal investigation, "'reasonableness generally requires the obtaining of a judicial warrant.'" *Id.* (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)). "A warrantless search of a person is reasonable only if it falls within a recognized exception[]" to the warrant requirement. *Cole*, 490

15

S.W.3d at 922; *see also State v. Villarreal*, 475 S.W.3d 784, 796 (Tex. Crim. App.

2014), *cert. denied*, 136 S. Ct. 2544 (2016).[3]

In *Cole* and in *Weems v. State*, 493 S.W.3d 574 (Tex. Crim. App. 2016), the

Court of Criminal Appeals summarized the applicable law pertaining to exigent

circumstances and warrantless blood draws.

> As *Villarreal* made plain, a warrantless search is *per se* unreasonable unless it falls within a well-recognized exception to the warrant requirement. The exigency exception operates "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." Exigency potentially provides for a reasonable, yet warrantless search "because 'there is compelling need for official action and no time to secure a warrant.'" Whether law enforcement faced an emergency that justifies acting without a warrant calls for a case-by-case determination based on the totality of circumstances. "[A] warrantless search must be strictly circumscribed by the exigencies which justify its initiation." An exigency analysis requires an objective evaluation of the facts reasonably available to the officer at the time of the search.

> In *Schmerber v. California*, [384 U.S. 757, 770-72 (1966)] the United States Supreme Court held that, based on the circumstances surrounding the search, a warrantless seizure of a driver's blood was reasonable.

---

[3] Post *Missouri v. McNeely*, 133 S. Ct. 1552 (2013), and prior to the denial of the rehearing in *Villarreal*, this Court issued opinions in two blood draw cases, *State v. Anderson*, 445 S.W.3d 895, 902-03 (Tex. App.—Beaumont 2014, no pet.), and *Gaubatz v. State*, No. 09-13-00401-CR, 2014 Tex. App. LEXIS 11833 (Tex. App.—Beaumont Oct. 29, 2014, pet. ref'd) (mem. op., not designated for publication), wherein we discussed the "totality of the circumstances" approach to warrantless searches as mandated and applied by the Supreme Court in *Missouri v. McNeely*.

. . . .

Adopting a totality-of-circumstances approach, the Court held that the circumstances surrounding the blood draw rendered the warrantless search reasonable: (1) the officer had probable cause that Schmerber operated a vehicle while intoxicated; (2) alcohol in the body naturally dissipates after drinking stops; (3) the lack of time to procure a warrant because of the time taken to transport Schmerber to a hospital and investigate the accident scene; (4) the highly effective means of determining whether an individual is intoxicated; (5) venipuncture is a common procedure and usually "involves virtually no risk, trauma, or pain"; and (6) the test was performed in a reasonable manner.

*Weems*, 493 S.W.3d at 578-79 (footnoted citations omitted).

. . . [T]he Court in *McNeely* held that the natural dissipation of alcohol in the bloodstream did not create a *per se* exigency justifying an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing. The *McNeely* Court held firm to the warrant requirement by stating that "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Yet the Court still recognized the gravity of the body's natural metabolic process and the attendant evidence destruction over time. With this balance in mind, the Court adhered to a totality of the circumstances analysis with the notion that certain circumstances may permit a warrantless search of a suspect's blood. The narrow issue before the Court prohibited it from providing an exhaustive analysis of when exigency in intoxication related offenses may be found. However, the Court provided insight on the issue by identifying a few relevant circumstances that may establish exigency in this context. In addition to the body's metabolization, they include "the procedures in place for obtaining a warrant,["] "the availability of a magistrate judge," and "the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence."

*Cole*, 490 S.W.3d at 924 (footnoted citations omitted).

17

As recognized in *McNeely*, even in "routine" DWI cases, a combination of factors could combine to create exigency, depending upon the particular circumstances in each case:

> Although the Missouri Supreme Court referred to this case as "unquestionably a routine DWI case," the fact that a particular drunk-driving stop is "routine" in the sense that it does not involve "'special facts,'" such as the need for the police to attend to a car accident, does not mean a warrant is required. Other factors present in an ordinary traffic stop, such as the procedures in place for obtaining a warrant or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search. The relevant factors in determining whether a warrantless search is reasonable, including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case.

*McNeely*, 133 S. Ct. at 1568 (citations omitted).[4]

---

[4] The State alleged in its bill of information in this case that Dennison was operating a motor vehicle in a public place, while intoxicated, and the information did not allege any prior offenses. The State made no argument at trial nor does it argue on appeal that Dennison's blood was drawn pursuant to a subdivision of section 724.012(b). *See* Tex. Transp. Code Ann. § 724.012(b)(1) (West 2011). As we previously stated in *Anderson* and *Gaubatz*,

> Simply because the statute requires the taking of a specimen of the person's breath or blood, however, does not end our inquiry. "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrong doing . . . reasonableness generally requires the obtaining of a judicial warrant[.]" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652-53 (1995). "In the absence of a warrant, a search is reasonable only if it falls within a specific [recognized]

18

The exigency exception applies "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Id.* at 1558 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). Exigent circumstances may justify a reasonable yet warrantless search "because 'there is compelling need for official action and no time to secure a warrant.'" *Id.* at 1559 (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). Whether law enforcement faced an emergency that justified acting without a warrant calls for a case-by-case determination based on the totality of circumstances. *Id.* An exigent circumstances analysis requires an objective evaluation of the facts reasonably available to the officer at the time of the search. *Cole*, 490 S.W.3d at 923 (citing *Stuart*, 547 U.S. at 404).

In *Cole*, the Court of Criminal Appeals concluded that a warrantless search was justified under the exigency exception to the Fourth Amendment's warrant requirement. *Id.* at 927. Cole ran a red light and struck a pickup truck, causing an

---

exception to the warrant requirement." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014). There is no language in section 724.012(b) that authorizes a police officer to take the specimen without a warrant. *See McGruder v. State*, No. 10-13-00109-CR, 2014 Tex. App. LEXIS 9022, at *7 (Tex. App.—Waco Aug. 14, 2014, no pet. h.) (mem. op.).

*Gaubatz*, 2014 Tex. App. LEXIS 11833, at **13-14 (quoting *Anderson*, 445 S.W.3d at 902).

19

explosion that killed the driver of the pickup truck. *Id.* at 920. Officer Castillo was the first officer on the scene, Castillo and other officers removed Cole from Cole's vehicle and EMS personnel arrived shortly thereafter and began evaluating Cole's injuries. *Id.* The lead accident investigator, Officer Higginbotham, arrived on the scene after the EMS had already removed Cole and taken Cole to the hospital. *Id.* Higginbotham then spent approximately three hours at the scene of the accident performing his investigation, which was the "most significant obstacle law enforcement faced in obtaining a warrant for Cole's blood." *Id.* at 920, 925. The severity of the accident caused debris to be strewn along the road for about a block, and Officer Higginbotham had to complete his investigation of the roadway, damaged vehicles, distances, and debris to "form probable cause to believe that Cole was responsible for the accident" and the other driver's death. *Id.* at 925. Additionally, the time to complete the investigation and lack of available law enforcement personnel also hindered the warrant process. *Id.*

> Higginbotham testified that he believed it was not feasible for him to leave the accident scene and abandon the accident investigation or to wait until the accident investigation was complete before attempting to obtain a warrant. Because he was the only available officer capable of performing the accident investigation, his continued presence at the scene was vital. And without first completing the investigation, debris could not be cleared from the intersection and reopened to traffic. In Higginbotham's estimation, Officer Wright would not be able to obtain a warrant for him. After placing Cole under arrest, Wright was now responsible for his custody at the hospital and could no longer

20

handle that responsibility while simultaneously drawing up a statement regarding her belief of Cole's intoxication.

The accident scene's location and the public-safety danger required a number of officers at the scene to perform necessary responsibilities including securing the accident scene, directing traffic, and keeping the public away from the scene. We do not disagree with the court of appeals' conclusion that "[t]here is no indication that officers not on the scene were unavailable to help obtain a warrant." We do disagree, however, that an exigency finding cannot be made without the record establishing—and by extension, the State proving—that there was no other officer available to get a warrant in the lead investigator's stead. In all but the rarest instances, there will theoretically be an officer somewhere within the jurisdiction that could assist the lead investigator. Requiring such a showing in every case where exigency is argued improperly injects the courts into local law-enforcement personnel management decisions and public policing strategy. It further reduces the exigency exception to an exceedingly and inappropriately small set of facts, and would defeat a claim of exigency on the basis of a single circumstance in direct opposition to the totality-of-circumstances review *McNeely* requires. Nonetheless, the availability of other officers is a relevant consideration in an exigency analysis.

This record establishes that fourteen officers were present and who, in Higginbotham's estimation, were all performing important law enforcement or public-safety duties. Taking any one of them away, according to Higginbotham, would have left a necessary duty unfulfilled. This record further reflects that the fourteen officers at the scene made up nearly half of the minimum amount of officers the Longview Police Department requires for the entire city over two shifts. By the same estimation, the record does not establish that there was a readily available officer who could have gotten a warrant while Higginbotham continued his investigation and Wright kept Cole in custody at the hospital.

Even had Higginbotham attempted to secure a warrant from an on-call magistrate, the issuance of a warrant would have taken an hour to an

21

hour and a half "at best." During that time, Higginbotham was reasonably concerned that both potential medical intervention performed at the hospital and the natural dissipation of methamphetamine in Cole's body would adversely affect the reliability of his blood sample. According to EMS, Cole reported having "pain all over." Higginbotham was reasonably concerned that the administration of pain medication, specifically narcotics, would affect the blood sample's integrity.

In addition to the logistical obstacles of securing a warrant, Higginbotham knew that during the hour to an hour and a half necessary to obtain a warrant Cole's body would continue to metabolize the methamphetamine and other intoxicating substances he may have ingested. The court of appeals correctly notes that the record does not contain evidence regarding the rate the body metabolizes methamphetamine. But the lack of a known elimination rate of a substance law enforcement believes a suspect ingested does not necessarily mean that the body's natural metabolism of intoxicating substances is irrelevant to or cuts against the State's exigency argument. In fact, it serves to distinguish this case from *McNeely*.

The *McNeely* Court relied in significant part on the widely known fact that alcohol "naturally dissipates over time in a gradual and relatively predictable manner." The lack of a known elimination rate is at odds with the undercurrent running through the *McNeely* opinion: While time is of the essence, a minimally delayed test when dealing with an alcohol-related offense does not drain the test of reliability because experts can work backwards to calculate blood-alcohol content at an earlier date. In this case, without a known elimination rate of methamphetamine, law enforcement faced inevitable evidence destruction without the ability to know—unlike alcohol's widely accepted elimination rate—how much evidence it was losing as time passed.

*Id.* at 925-27. From a review of the totality of the circumstances, the Court

concluded that

22

law enforcement reasonably believed that obtaining a warrant in this case would have significantly undermined the efficacy searching Cole's blood. The circumstances surrounding the taking of Cole's blood sample demonstrate that obtaining a warrant was impractical. Like the officer in *Schmerber*, law enforcement was confronted with not only the natural destruction of evidence through natural dissipation of intoxicating substances, but also with the logistical and practical constraints posed by a severe accident involving a death and the attendant duties this accident demanded. We therefore conclude that exigent circumstances justified Cole's warrantless blood draw.

*Id.* at 927 (footnoted citations omitted).

In contrast to *Cole*, the Court of Criminal Appeals held in *Weems* that "[o]n review of the totality of the circumstances found in the record, we conclude that Weems's warrantless blood draw was not justified by exigent circumstances." *Weems*, 493 S.W.3d at 580. Weems was involved in a one-car accident when he drove himself and a friend home from a bar where the two had been drinking alcohol. *Id.* at 575. On the way home, Weems's car veered off the road, flipped over, and hit a utility pole. *Id.* A nearby witness testified she observed Weems crawl out of the vehicle from the driver's side window, and when the witness asked if Weems was okay, Weems said he was drunk. *Id.* Weems then fled the scene. *Id.* The witness called 911, and Deputy Munoz responded to the call and later found Weems hiding under a nearby parked car, nearly forty minutes after the accident. *Id.* at 575-76, 581.

Deputy Bustamante testified that he took custody of Weems and noticed Weems's bloodshot eyes, slurred speech, bloodied face, inability to stand, and a strong smell of alcohol on Weems's breath. *Id.* at 576. Because Bustamante believed Weems had sustained injuries in the accident, the officer did not conduct field sobriety tests. *Id.* Based upon his observations, the officer arrested Weems on suspicion of driving while intoxicated. *Id.* Weems refused to give a breath sample or blood sample, and EMS provided treatment to Weems at the location of his arrest, and then transported Weems to the hospital for further treatment. *Id.* Deputy Bustamante followed the ambulance to the hospital, which took only a couple of minutes, and Bustamante filled out a form for the hospital to draw blood from Weems. *Id.* Bustamante was not the only deputy charged with investigating the accident, and he was accompanied by Deputy Shannon, Bustamante's instructor. *Id.* at 582. Because the hospital was busy that evening, Weems's blood was not drawn until about two hours after Weems was arrested. *Id.* at 576. The testing of the blood revealed that Weems had a .18 blood-alcohol concentration. *Id.* Prior to his trial, Weems filed a motion to suppress the evidence relating to the warrantless blood draw. *Id.* Without making any findings of fact or conclusions of law, the trial court denied the motion to suppress, and Weems was tried and convicted by the jury. *Id.* On appeal, Weems argued that the trial court erred in denying the motion

24

to suppress the blood alcohol evidence, and the Fourth Court of Appeals agreed the trial court erred and found the admission of the evidence harmful. *Id.*

On review, the Court of Criminal Appeals affirmed. *Id.* at 582. The Court held that "[o]n review of the totality of the circumstances found in the record, we conclude that Weems's warrantless blood draw was not justified by exigent circumstances." *Id.* at 580. The Court explained that "[a]side from Weems's own self-imposed delay" when he fled the scene and the forty minutes worth of alcohol dissipation caused by Weems, "little else in the record lends support to finding exigency in this case." *Id*. at 581. The record was silent as to whether Bustamante knew that it would take over two hours for the hospital to draw the blood, but the testimony from Bustamante suggested that substantial delay in obtaining Weems's blood was "at least forseeable." *Id.* Bustamante described the routine practice of transporting suspects to the magistrate's office, and if the suspect refused to consent to the blood draw, then the deputy would draw up an affidavit and present it to the magistrate for a warrant. *Id.* There was no testimony in the record about how long the process would take. *Id.* The record did not reflect what procedures were in place, if any, for obtaining a warrant when the suspect is taken to the hospital or whether Bustamante could have reasonably obtained a warrant. *Id*. The Court concluded that it was unable to weigh the time and effort required to obtain a

warrant against the circumstances that informed Bustamante's decision to order the warrantless blood draw. *Id.* The Court expressly distinguished the facts from those in *Schmerber*:

> Although both this case's record and that presented in *Schmerber* involved an alcohol-involved accident, the similarity of the two records end there. In *Schmerber*, the Court noted "where time had to be taken to bring the accused to the hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." This passage does not accurately describe the circumstances surrounding Weems's blood draw. First, Deputy Bustamante testified that the hospital was only a "couple of minutes" away. So transporting Weems to the hospital did not necessarily make obtaining a warrant impractical or unduly delay the taking of Weems's blood to the extent that natural dissipation would significantly undermine a blood test's efficacy. Second, Bustamante was not alone charged with both investigating the scene of the accident and escorting Weems to the hospital for treatment. Deputy Shannon—Bustamante's instructor—waited with Bustamante and Weems at the hospital until Weems's blood was taken. Once the blood was drawn, Shannon left the hospital to place the blood sample in the evidence locker at the Magistrate's Office for subsequent testing. Another [officer's] presence or the "hypothetically available officer" that, in theory, could have secured a warrant in the arresting officer's stead will certainly not render all warrantless blood draws a Fourth Amendment violation, nor do we suggest it is a circumstance that the State must disprove in every case to justify a warrantless search under an exigency theory. But this record establishes that Shannon was with Bustamante and Weems throughout the investigation and while they were at the hospital waiting for Weems's blood to be drawn. On this particular record, Shannon's continued presence distinguishes *Schmerber* from the present case and militates against a finding that practical problems prevented the State from obtaining a warrant within a time frame that preserved the opportunity to obtain reliable evidence.

*Id.* at 582 (footnoted citations omitted).

Regarding Dennison's specific challenges to findings of fact 11, 12, and 15, we note that the trial court expressly found the testimony of Officer Wirfs, Trooper Sarrett, and Deputy Flores to be credible and reliable. Deputy Flores agreed that he knew that Judge Flores was "unattainable" that night because the Deputy had spoken to Judge Flores prior to that night, and Deputy Flores knew that his father, Judge Flores, was "out of town[]" and outside Jefferson County at that time. Trooper Sarrett explained that, at the time of the accident, there was no procedure in place to obtain a blood draw warrant at that hour and that, based upon past experience, Judge Flores was the only judge that was used for such warrants because "he was the only one who was available anytime we tried to get ahold of him later in the evening." Trooper Sarrett testified that, given the facts that she was aware of on the evening in question, Judge Flores was not available to sign a warrant. Trooper Sarrett testified that "[Judge Flores's] son was actually at the crash scene and said that [Judge Flores] was out of town." According to Trooper Sarrett, the only judge she had been able to use at a late hour was Judge Flores and she was informed by Judge Flores's son that Judge Flores was unavailable. Trooper Sarrett testified that because Judge Flores was not available she could not obtain a warrant in this case, and she did not know how long it would have taken to

27

find another judge. Trooper Sarrett also explained that she did not ask the other officer who was with her that night to call dispatch regarding getting a judge for a warrant because "there wasn't a judge available." Giving almost total deference to the trial court's determination of historical facts, we conclude the evidence supports the trial court's factual findings 11, 12, and 15, and the trial court did not abuse its discretion in making such findings.

Based upon the totality of the circumstances, considering the testimony of Trooper Sarrett, along with the testimony from Officer Wirfs and Deputy Flores, as well as the video footage, and the remainder of the evidence submitted before the trial court at the hearing, exigent circumstances justified the warrantless blood draw. We find the facts before us to be more aligned with *Cole* and distinguishable from *Weems*. Unlike *Weems*, the investigating officer, Trooper Sarrett, testified that she was solely responsible for the DPS investigation of this accident, that Judge Flores was the only Judge she could call for a blood warrant, and further that based upon information provided by Deputy Flores, Judge Flores's son, Judge Flores was unavailable at the time of the accident. According to Trooper Sarrett, there was no on-call system in place to get in touch with another Judge in May of 2014, there was no official procedure in place to obtain a blood draw warrant at that time, and based on her own experience, if Judge Flores was not available, she

28

would not be able to find a judge to sign off on a warrant. Trooper Sarrett did have another trooper with her at the scene of the accident and at the hospital. Nevertheless, the trial court found Trooper Sarrett to be a credible witness and found that her testimony was uncontroverted. The trial court also found Officer Wirfs and Deputy Flores to be reliable and credible witnesses. Unlike *Weems* where the drive to the hospital was only a "couple" of minutes, in the present case the drive from the scene of Dennison's accident to the hospital was approximately thirty minutes. And, unlike *Weems*, the testimony from Trooper Sarrett affirmatively established that there was no on-call procedure in place to secure a blood-alcohol warrant and the Judge who normally issued such warrants was unavailable.

Similar to the facts in *Cole*, the record establishes that Trooper Sarrett had to secure the scene, take statements, and conduct an accident investigation that took approximately two hours, before she could leave and drive to the hospital to interview Dennison. *See Cole*, 490 S.W.3d at 920, 925. While at the scene, Trooper Sarrett discovered through Deputy Flores, a reliable source, that Judge Flores, the only judge available to sign a blood warrant, was out of town and could not be reached for a warrant. Deputy Flores testified that he had personal knowledge that his father was unavailable to sign a warrant. According to Trooper

29

Sarrett, it was known to the officers that it was more difficult to reach a judge late at night and early in the morning than during office hours, and no judge was routinely or consistently available to sign off on blood warrants at that time. Trooper Sarrett testified that she could not task someone else with obtaining a warrant because each DPS officer takes care of his or her own cases. Dennison presented a flight risk because he was trying to leave the hospital against medical advice and refused to cooperate with her investigation. Additionally, by the time Trooper Sarrett was able to get to the hospital to speak with Dennison, Dennison had already left the hospital against medical advice. Trooper Sarrett testified that she asked Dennison to remain in the hospital parking lot so that she could further investigate, that she smelled alcohol on Dennison's breath at the hospital, and that Dennison had red, glassy eyes. Trooper Sarrett conducted the HGN test on Dennison and Dennison performed poorly and the test showed six of six clues. Trooper Sarrett asked Dennison to continue with other tests but Dennison refused to perform further field sobriety testing and stated that he wanted to check himself back into the hospital. Trooper Sarrett testified that further medical care and treatment could have altered the content of his blood, and she believed the introduction of medication into Dennison's system could make the results of a blood test less reliable.

On the record before it, the trial court could have reasonably determined that Trooper Sarrett went to the hospital as soon as was practicable considering the circumstances. The findings of fact entered by the trial court depend in large part on the trial court's assessment of the testimony from and credibility of Trooper Sarrett, Officer Wirfs, and Deputy Flores, and we must defer to the trial court's determination of such matters. *See Crain*, 315 S.W.3d at 48. Considering the totality of the circumstances, we conclude exigent circumstances justified the warrantless blood draw, and the trial court did not err in denying Dennison's motion to suppress. *See Schmerber*, 384 U.S. at 770-71; *Cole*, 490 S.W.3d at 927; *see also Cosino v. State*, No. 10-14-00221-CR, 2016 Tex. App. LEXIS 11431, at *22 (Tex. App.—Waco Oct. 19, 2016, pet. ref'd) (upholding trial court's denial of motion to suppress warrantless blood draw because exigent circumstances existed; suspect did not give consent, blood draw occurred about two and a half hours after the accident, and police officer testified it would have taken another hour and a half to obtain a warrant).

For the foregoing reasons, we overrule Dennison's issues and affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on July 14, 2016
Opinion Delivered January18, 2017
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.